**EXHIBIT A**

**JUDGE SULLIVAN**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**07 CIV 8071**

--------------------------------------------------------------------

MERRILL LYNCH BUSINESS FINANCIAL
SERVICES INC.,

:

07 CV ____ (__)

:

                    Plaintiff,

:

       -against-

:

**COMPLAINT**

ADDRESSING SYSTEMS AND PRODUCTS INC.,
MARSHALL GOLDBERG, TEMAR INC., and
"JOHN DOE #1" THROUGH "JOHN DOE #12",
the last twelve names being fictitious and unknown to
plaintiff, being persons having or claiming an interest
in or lien upon the Collateral described in the complaint,

:
:
:
:
:
:



                    Defendants.

:
:

--------------------------------------------------------------------x

       Plaintiff, Merrill Lynch Business Financial Services Inc., by its attorney, Spencer L. Schneider, complains of defendants as follows:

Parties

       1.  Merrill Lynch Business Financial Services Inc. ("MLBFS") is incorporated under the laws of the State of Delaware with its principal place of business at 222 North LaSalle Street, Chicago, IL 60601.

       2.  Upon information and belief, defendant Addressing Systems and Products, Inc. ("ASAP") is a New York corporation and has its principal place of business at 2 Penn Plaza, 26th Floor, New York, NY 10121.

       3.  Upon information and belief, defendant Temar, Inc.("Temar") is a New Jersey Corporation and has its principal place of business at 14 East Hill Court, Tenafly, NJ 07670.

       4.  Upon information and belief, defendant Marshall Goldberg is domiciled at 30 Sutton

Place, Englewood, NJ 07631.

    5.  Upon information and belief, defendants "John Doe #1" through "John Doe #12", are fictitious and unknown to plaintiff, being persons having or claiming an interest in or lien upon the collateral described hereinafter.

Jurisdiction and Venue

    6.  Subject matter jurisdiction exists under 28 USC §1332 because there is complete diversity and the amount in controversy exceeds $75,000 exclusive of interest and costs.

    7.  Venue exists under 28 USC §1391 because defendant ASAP resides in this judicial district.

Claim

    8.  On July 24, 2000, defendant ASAP and plaintiff entered into a WCMA Loan and Security Agreement ("WCMA Note") and plaintiff granted ASAP an $800,000 line of credit, which was subsequently lowered during the term of the loan.

    9.  A copy of the WCMA Note is attached as Exhibit A.

    10. Under the WCMA Note, ASAP promised to repay to plaintiff all unpaid amounts of all monies lent by plaintiff to it, including interest, attorneys' fees and any late fees, and it waived presentment, demand for payment, protest, notice of protest, and notice of dishonor, notice of acceleration, notice of intent to accelerate and all other notices and formalities.

    11. In order to induce plaintiff to enter into the WCMA Note, on July 24, 2000, defendants Goldberg and Temar gave plaintiff their absolute and unconditional guaranties (collectively, the "Guaranties) of ASAP's indebtedness and promised to repay the entire indebtedness to plaintiff upon a default of the WCMA Note. At all relevant times, defendant Goldberg was a principal of ASAP and Temar.

2

12. Copies of the Guaranties are attached as Exhibit B.

13. To further induce plaintiff to enter into the WCMA Note, defendants ASAP and Temar granted plaintiff perfected security interests in all of their accounts, chattel paper, contract rights, inventory, equipment, fixtures, general intangibles, deposit accounts, documents, instruments, investment property and financial assets, wherever located, and all the proceeds (collectively, the "Collateral").

14. Under the WCMA Note, defendant ASAP agreed, among other things, to regularly furnish plaintiff with certain financial information and not to borrow more than the maximum line of credit allotted under the loan. According to the WCMA Note, the uncured breach of these provisions constitutes an event of default entitling plaintiff to terminate the line of credit and accelerate the indebtedness.

15. On July 26, 2006, plaintiff sent defendant ASAP a demand notice which, among other things, informed defendant that it had exceeded the maximum loan balance and that the failure to repay the overdraft would result in an event of default under the WCMA Note. ASAP failed to comply.

16. On August 3, 2006, plaintiff sent defendants a notice of default and demand for payment.

17. Defendants represented to plaintiff that they were unable to fully repay the debt and requested that plaintiff forbear from exercising its right and remedies under the WCMA Note and Guaranties.

18. On November 16, 2006, plaintiff and defendants entered into a forbearance agreement ("Forbearance Agreement") under which defendants reaffirmed and admitted the indebtedness and agreed to repay it on a monthly basis according to a schedule. In exchange, plaintiff agreed to forbear from exercising its rights conditional upon compliance with the terms of the Forbearance

3

Agreement.

19. A copy of the Forbearance Agreement is attached as Exhibit C.

20. On February 21, 2007, plaintiff sent defendant ASAP a notice demanding that it provide it with monthly interim financial statements and A/R agings as required under the WCMA Note. Defendant ASAP failed to comply.

21. On June 18, 2007, plaintiff sent defendant ASAP another notice demanding that it provide the above-mentioned financial material as well as the $10,000 monthly payments due in May 2007 and June 2007. Defendant ASAP failed to comply.

22. By failing to supply the financial documentation or pay the monthly installments, the entire debt became due under the WCMA Note, Forbearance Agreement, and Guaranties.

23. As of September 13, 2007, the indebtedness owed to plaintiff is $350,811.71, exclusive of accrued interest, additional amounts due under the WCMA Note, and attorneys' fees and costs.

FIRST CAUSE OF ACTION

24. The allegations of paragraphs 1 through 23 above are incorporated herein as if set forth in full.

25. The indebtedness owed and guaranteed by the defendants is outstanding and due.

26. Defendants breached the WCMA Note, Forbearance Agreement, and Guaranties by failing to timely repay the indebtedness.

27. Plaintiff has been damaged as a result of defendants' breaches in the amount of $350,811.71, exclusive of accrued interest, additional amounts due under the WCMA Note, and attorneys' fees and costs.

SECOND CAUSE OF ACTION

28. The allegations of paragraphs 1 through 27 above are incorporated herein as if set forth

4

in full.

29. At all relevant times, plaintiff has been entitled to possession of the Collateral by virtue of the breach of the WCMA Note and the perfected security interests.

30. Defendants have wrongfully withheld the Collateral from the possession of the plaintiff.

31. Plaintiff has been damaged and is entitled to possession of the Collateral.

Demand for Relief

WHEREFORE, plaintiff demands, against defendants, damages in the amount of $350,811.71, plus accrued interest, additional amounts due under the WCMA Note, and attorneys' fees and costs, plus possession of the Collateral.

Dated: New York, New York
      September 13, 2007

SPENCER L. SCHNEIDER (SS-2471)

Attorney for Plaintiff
70 Lafayette Street, 7th Floor
New York, NY 10013
Tel: (212) 233-7400
Fax: (212) 233-9713
sschneider@slsatty.com

5

EXHIBIT A

## Merrill Lynch                                         WCMA® LOAN AND SECURITY AGREEMENT

WCMA LOAN AND SECURITY AGREEMENT NO. 879-07D04 ("Loan Agreement") dated as of July 24, 2000, between **ADDRESSING SYSTEMS AND PRODUCTS, INC.**, a corporation organized and existing under the laws of the State of New York having its principal office at 208 West 30th Street, New York, NY 10001-4907 ("Customer"), and **MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.**, a corporation organized and existing under the laws of the State of Delaware having its principal office at 222 North LaSalle Street, Chicago, IL 60601 ("MLBFS").

In accordance with that certain **WORKING CAPITAL MANAGEMENT® ACCOUNT AGREEMENT NO. 879-07D04** ("WCMA Agreement") between Customer and MLBFS' affiliate, **MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED** ("MLPF&S"), Customer has subscribed to the WCMA Program described in the WCMA Agreement. The WCMA Agreement is by this reference incorporated as a part hereof. In conjunction therewith and as part of the WCMA Program, Customer has requested that MLBFS provide, and subject to the terms and conditions herein set forth MLBFS has agreed to provide, a commercial line of credit for Customer (the "WCMA Line of Credit").

Accordingly, and in consideration of the premises and of the mutual covenants of the parties hereto, Customer and MLBFS hereby agree as follows:

### Article I. DEFINITIONS

1.1 **Specific Terms.** In addition to terms defined elsewhere in this Loan Agreement, when used herein the following terms shall have the following meanings:

(a) "Account Debtor" shall mean any party who is or may become obligated with respect to an Account or Chattel Paper.

(b) "Activation Date" shall mean the date upon which MLBFS shall cause the WCMA Line of Credit to be fully activated under MLPF&S' computer system as part of the WCMA Program.

(c) "Additional Agreements" shall mean all agreements, instruments, documents and opinions other than this Loan Agreement, whether with or from Customer or any other party, which are contemplated hereby or otherwise reasonably required by MLBFS in connection herewith, or which evidence the creation, guaranty or collateralization of any of the Obligations or the granting or perfection of liens or security interests upon the Collateral or any other collateral for the Obligations.

(d) "Bankruptcy Event" shall mean any of the following: (i) a proceeding under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt or receivership law or statute shall be filed or consented to by Customer or any Guarantor; or (ii) any such proceeding shall be filed against Customer or any Guarantor and shall not be dismissed or withdrawn within sixty (60) days after filing; or (iii) Customer or any Guarantor shall make a general assignment for the benefit of creditors; or (iv) Customer or any Guarantor shall generally fail to pay or admit in writing its inability to pay its debts as they become due; or (v) Customer or any Guarantor shall be adjudicated a bankrupt or insolvent.

(e) "Business Day" shall mean any day other than a Saturday, Sunday, federal holiday or other day on which the New York Stock Exchange is regularly closed.

(f) "Collateral" shall mean all Accounts, Chattel Paper, Contract Rights, Inventory, Equipment, Fixtures, General Intangibles, Deposit Accounts, Documents, Instruments, Investment Property and Financial Assets of Customer, howsoever arising, whether now owned or existing or hereafter acquired or arising, and wherever located; together with all parts thereof (including spare parts), all accessories and accessions thereto, all books and records (including computer records) directly related thereto, all proceeds thereof (including, without limitation, proceeds in the form of Accounts and insurance proceeds), and the additional collateral described in Section 3.6 (b) hereof.

(g) "Commitment Expiration Date" shall mean August 23, 2000.

(h) "Default" shall mean either an "Event of Default" as defined in Section 3.5 hereof, or an event which with the giving of notice, passage of time, or both, would constitute such an Event of Default.

(i) "Default Interest Rate" shall mean a rate equal to the sum of the "Interest Rate", as determined below, plus two percent (2%) per annum.

(j) "General Funding Conditions" shall mean each of the following conditions to any WCMA Loan by MLBFS hereunder: (i) no Default shall have occurred and be continuing or would result from the making of any WCMA Loan hereunder by MLBFS; (ii) there shall not have occurred and be continuing any material adverse change in the business or financial condition of Customer or any Guarantor; (iii) all representations and warranties of Customer or any Guarantor herein or in any Additional Agreements shall then be true and correct in all material respects; (iv) MLBFS shall have received this Loan Agreement and all of the Additional Agreements, duly executed and filed or recorded where applicable, all of which shall be in form and substance reasonably satisfactory to MLBFS; (v) MLBFS shall have received evidence reasonably satisfactory to it as to the ownership of the Collateral and the perfection and priority of MLBFS' liens and security interests thereon, as well as the ownership of and the perfection and priority of MLBFS' liens and security interests on any other collateral for the Obligations furnished pursuant to any of the Additional Agreements; (vi) MLBFS shall have received evidence reasonably satisfactory to it of the insurance required hereby or by any of the Additional Agreements; and (vii) any additional conditions specified in the "WCMA Line of Credit Approval" letter executed by MLBFS with respect to the transactions contemplated hereby shall have been met to the reasonable satisfaction of MLBFS.

(k) "Guarantor" shall mean a person or entity who has either guaranteed or provided collateral for any or all of the Obligations; and "Business Guarantor" shall mean any such Guarantor that is a corporation, partnership, proprietorship, limited liability company or other entity regularly engaged in a business activity.

(l) "Initial Maturity Date" shall mean the first date upon which the WCMA Line of Credit will expire (subject to renewal in accordance with the terms hereof); to wit: July 31, 2001.

(m) "Interest Due Date" shall mean the last Business Day of each calendar month during the term hereof (or, if Customer makes special arrangements with MLPF&S, the last Friday of each calendar month during the term hereof).

(n) "Interest Rate" shall mean a variable per annum rate of interest equal to the sum of 3.15% and the 30-day Dealer Commercial Paper Rate. The "30-day Dealer Commercial Paper Rate" shall mean, as of the date of any determination, the interest rate from time to time published in the "Money Rates" section of *The Wall Street Journal* as the "Dealer Commercial Paper" rate for 30-day high-grade unsecured notes sold through dealers by major corporations. The Interest Rate will change as of the date of publication in *The Wall Street Journal* of a 30-day Dealer Commercial Paper Rate that is different from that published on the preceding Business Day. In the event that *The Wall Street Journal* shall, for any reason, fail or cease to publish the 30-day Dealer Commercial Paper Rate, MLBFS will choose a reasonably comparable index or source to use as the basis for the Interest Rate. Upon the occurrence and during the continuance of a Default, the Interest Rate with respect the WCMA Line of Credit may be increased to the "Default Interest Rate", as herein provided.

(o) "Line Fee" shall mean a fee of $6,000.00 payable periodically by Customer to MLBFS in accordance with the provisions of Section 2.2 (k) hereof.

(p) "Location of Tangible Collateral" shall mean the address of Customer set forth at the beginning of this Loan Agreement, together with any other address or addresses set forth on an exhibit hereto as being a Location of Tangible Collateral.

(q) "Maturity Date" shall mean the date of expiration of the WCMA Line of Credit.

(r) "Maximum WCMA Line of Credit" shall mean $800,000.00.

(s) "Obligations" shall mean all liabilities, indebtedness and other obligations of Customer to MLBFS, howsoever created, arising or evidenced, whether now existing or hereafter arising, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary or joint or several, and, without limiting the foregoing, shall include interest accruing after the filing of any petition in bankruptcy, and all present and future liabilities, indebtedness and obligations of Customer under this Loan Agreement.

(t) "Permitted Liens" shall mean with respect to the Collateral: (i) liens for current taxes not delinquent, other non-consensual liens arising in the ordinary course of business for sums not due, and, if MLBFS' rights to and interest in the Collateral are not materially and adversely affected thereby, any such liens for taxes or other non-consensual liens arising in the ordinary course of business being contested in good faith by appropriate proceedings; (ii) liens in favor of MLBFS; (iii) liens which will be discharged with the proceeds of the initial WCMA Loan; and (iv) any other liens expressly permitted in writing by MLBFS.

(u) "Renewal Year" shall mean and refer to the 12-month period immediately following the Initial Maturity Date and each 12-month period thereafter.

(v) "WCMA Account" shall mean and refer to the Working Capital Management Account of Customer with MLPF&S identified as Account No. 879-07D04 and any successor Working Capital Management Account of Customer with MLPF&S.

(w) "WCMA Loan" shall mean each advance made by MLBFS pursuant to this Loan Agreement.

(x) "WCMA Loan Balance" shall mean an amount equal to the aggregate unpaid principal amount of all WCMA Loans.

1.2 Other Terms. Except as otherwise defined herein: (i) all terms used in this Loan Agreement which are defined in the Uniform Commercial Code of Illinois ("UCC") shall have the meanings set forth in the UCC, and (ii) capitalized terms used herein which are defined in the WCMA Agreement shall have the meanings set forth in the WCMA Agreement.

## ARTICLE II. THE WCMA LINE OF CREDIT

2.1 WCMA PROMISSORY NOTE. FOR VALUE RECEIVED, Customer hereby promises to pay to the order of MLBFS, at the times and in the manner set forth in this Loan Agreement, or in such other manner and at such place as MLBFS may hereafter designate in writing, the following: (a) on the Maturity Date, or if earlier, on the date of termination of the WCMA Line of Credit, the WCMA Loan Balance; (b) interest at the Interest Rate (or, if applicable, at the Default Interest Rate) on the outstanding WCMA Loan Balance, from and including the date on which the initial WCMA Loan is made until the date of payment of all WCMA Loans in full; and (c) on demand, all other sums payable pursuant to this Loan Agreement, including, but not limited to, the periodic Line Fee. Except as otherwise expressly set forth herein, Customer hereby waives presentment, demand for payment, protest and notice of protest, notice of dishonor, notice of acceleration, notice of intent to accelerate and all other notices and formalities in connection with this WCMA Promissory Note and this Loan Agreement.

2.2 WCMA LOANS

(a) Activation Date. Provided that: (i) the Commitment Expiration Date shall not then have occurred, and (ii) Customer shall have subscribed to the WCMA Program and its subscription to the WCMA Program shall then be in effect, the Activation Date shall occur on or promptly after the date, following the acceptance of this Loan Agreement by MLBFS at its office in Chicago, Illinois, upon which each of the General Funding Conditions shall have been met or

-2-

satisfied to the reasonable satisfaction of MLBFS. No activation by MLBFS of the WCMA Line of Credit for a nominal amount shall be deemed evidence of the satisfaction of any of the conditions herein set forth, or a waiver of any of the terms or conditions hereof. Customer hereby authorizes MLBFS to pay out of and charge to Customer's WCMA Account on the Activation Date any and all amounts necessary to fully pay off any bank or other financial institution having a lien upon any of the Collateral other than a Permitted Lien.

(b) WCMA Loans. Subject to the terms and conditions hereof, during the period from and after the Activation Date to the first to occur of the Maturity Date or the date of termination of the WCMA Line of Credit pursuant to the terms hereof, and in addition to WCMA Loans automatically made to pay accrued interest, as hereafter provided: (i) MLBFS will make WCMA Loans to Customer in such amounts as Customer may from time to time request in accordance with the terms hereof, up to an aggregate outstanding amount not to exceed the Maximum WCMA Line of Credit, and (ii) Customer may repay any WCMA Loans in whole or in part at any time, and request a re-borrowing of amounts repaid on a revolving basis. Customer may request such WCMA Loans by use of WCMA Checks, FTS, Visa® charges, wire transfers, or such other means of access to the WCMA Line of Credit as may be permitted by MLBFS from time to time; it being understood that so long as the WCMA Line of Credit shall be in effect, any charge or debit to the WCMA Account which but for the WCMA Line of Credit would under the terms of the WCMA Agreement result in an overdraft, shall be deemed a request by Customer for a WCMA Loan.

(c) Conditions of WCMA Loans. Notwithstanding the foregoing, MLBFS shall not be obligated to make any WCMA Loan, and may without notice refuse to honor any such request by Customer, if at the time of receipt by MLBFS of Customer's request: (i) the making of such WCMA Loan would cause the Maximum WCMA Line of Credit to be exceeded; or (ii) the Maturity Date shall have occurred, or the WCMA Line of Credit shall have otherwise been terminated in accordance with the terms hereof; or (iii) Customer's subscription to the WCMA Program shall have been terminated; or (iv) an event shall have occurred and be continuing which shall have caused any of the General Funding Conditions to not then be met or satisfied to the reasonable satisfaction of MLBFS. The making by MLBFS of any WCMA Loan at a time when any one or more of said conditions shall not have been met shall not in any event be construed as a waiver of said condition or conditions or of any Default, and shall not prevent MLBFS at any time thereafter while any condition shall not have been met from refusing to honor any request by Customer for a WCMA Loan.

(d) Limitation of Liability. MLBFS shall not be responsible, and shall have no liability to Customer or any other party, for any delay or failure of MLBFS to honor any request of Customer for a WCMA Loan or any other act or omission of MLBFS, MLPF&S or any of their affiliates due to or resulting from any system failure, error or delay in posting or other clerical error, loss of power, fire, Act of God or other cause beyond the reasonable control of MLBFS, MLPF&S or any of their affiliates unless directly arising out of the willful wrongful act or active gross negligence of MLBFS. In no event shall MLBFS be liable to Customer or any other party for any incidental or consequential damages arising from any act or omission by MLBFS, MLPF&S or any of their affiliates in connection with the WCMA Line of Credit or this Loan Agreement.

(e) Interest. (i) An amount equal to accrued interest on the WCMA Loan Balance shall be payable by Customer monthly on each Interest Due Date, commencing with the Interest Due Date occurring in the calendar month in which the Activation Date shall occur. Unless otherwise hereafter directed in writing by MLBFS on or after the first to occur of the Maturity Date or the date of termination of the WCMA Line of Credit pursuant to the terms hereof, such interest will be automatically charged to the WCMA Account on the applicable Interest Due Date, and, to the extent not paid with free credit balances or the proceeds of sales of any Money Accounts then in the WCMA Account, as hereafter provided, paid by a WCMA Loan and added to the WCMA Loan Balance. All interest shall be computed for the actual number of days elapsed on the basis of a year consisting of 360 days.

(ii) Upon the occurrence and during the continuance of any Default, but without limiting the rights and remedies otherwise available to MLBFS hereunder or waiving such Default, the interest payable by Customer hereunder shall at the option of MLBFS accrue and be payable at the Default Interest Rate. The Default Interest Rate, once implemented, shall continue to apply to the Obligations under this Loan Agreement and be payable by Customer until the date such Default is either cured or waived in writing by MLBFS.

(iii) Notwithstanding any provision to the contrary in this Agreement or any of the Additional Agreements, no provision of this Agreement or any of the Additional Agreements shall require the payment or permit the collection of any amount in excess of the maximum amount of interest permitted to be charged by law ("Excess Interest"). If any Excess Interest is provided for, or is adjudicated as being provided for, in this Agreement or any of the Additional Agreements, then: (A) Customer shall not be obligated to pay any Excess Interest; and (B) any Excess Interest that MLBFS may have received hereunder or under any of the Additional Agreements shall, at the option of MLBFS, be: (1) applied as a credit against the then unpaid WCMA Loan Balance, (2) refunded to the payer thereof, or (3) any combination of the foregoing.

(f) Payments. All payments required or permitted to be made pursuant to this Loan Agreement shall be made in lawful money of the United States. Unless otherwise directed by MLBFS, payments on account of the WCMA Loan Balance may be made by the delivery of checks (other than WCMA Checks), or by means of FTS or wire transfer of funds (other than funds from the WCMA Line of Credit) to MLPF&S for credit to Customer's WCMA Account. Notwithstanding anything in the WCMA Agreement to the contrary, Customer hereby irrevocably authorizes and directs MLPF&S to apply available free credit balances in the WCMA Account to the repayment of the WCMA Loan Balance prior to application for any other purpose. Payments to MLBFS from funds in the WCMA Account shall be deemed to be made by Customer upon the same basis and schedule as funds are made available for investment in the Money Accounts in accordance with the terms of the WCMA Agreement. All funds received by MLPF&S pursuant to the aforesaid authorization shall be applied by MLBFS to repayment of the WCMA Loan Balance. The acceptance by or on behalf of MLBFS of a check or other payment for a lesser amount than shall be due from Customer, regardless of any endorsement or statement thereon or transmitted therewith, shall not be deemed an accord and satisfaction or anything other than a payment on account, and MLBFS or anyone acting on behalf of MLBFS may accept such check or other payment without prejudice to the rights of MLBFS to recover the balance actually due or to pursue any other remedy under this Loan Agreement or applicable law for such balance. All checks accepted by or on behalf of MLBFS in connection with the WCMA Line of Credit are subject to final collection.

(g) Irrevocable Instructions to MLPF&S. In order to minimize the WCMA Loan Balance, Customer hereby irrevocably authorizes and directs MLPF&S, effective on the Activation Date and continuing thereafter so long as this Agreement shall be in effect: (i) to immediately and prior to application for any other purpose pay to MLBFS to the extent of any WCMA Loan Balance or other amounts payable by Customer hereunder all available free credit balances from

-3-

time to time in the WCMA Account; and (ii) if such available free credit balances are insufficient to pay the WCMA Loan Balance and such other amounts, and there are in the WCMA Account at any time any investments in Money Accounts (other than any investments constituting any Minimum Money Accounts Balance under the WCMA Directed Reserve Program), to immediately liquidate such investments and pay to MLBFS to the extent of any WCMA Loan Balance and such other amounts the available proceeds from the liquidation of any such Money Accounts.

(h) **Statements.** MLPF&S will include in each monthly statement it issues under the WCMA Program information with respect to WCMA Loans and the WCMA Loan Balance. Any questions that Customer may have with respect to such information should be directed to MLBFS; and any questions with respect to any other matter in such statements or about or affecting the WCMA Program should be directed to MLPF&S.

(i) **Use of WCMA Loan Proceeds.** The proceeds of each WCMA Loan initiated by Customer shall be used by Customer solely for working capital in the ordinary course of its business, or, with the prior written consent of MLBFS, for other lawful business purposes of Customer not prohibited hereby. Customer agrees that under no circumstances will the proceeds of any WCMA Loan be used: (i) for personal, family or household purposes of any person whatsoever, or (ii) to purchase, carry or trade in securities, or repay debt incurred to purchase, carry or trade in securities, whether in or in connection with the WCMA Account, another account of Customer with MLPF&S or an account of Customer at any other broker or dealer in securities, or (iii) unless otherwise consented to in writing by MLBFS, to pay any amount to Merrill Lynch and Co., Inc. or any of its subsidiaries, other than Merrill Lynch Bank USA, Merrill Lynch Bank & Trust Co. or any subsidiary of either of them (including MLBFS and Merrill Lynch Credit Corporation).

(j) **Renewal at Option of MLBFS; Right of Customer to Terminate.** MLBFS may at any time, in its sole discretion and at its sole option, renew the WCMA Line of Credit for one or more Renewal Years; it being understood, however, that no such renewal shall be effective unless set forth in a writing executed by a duly authorized representative of MLBFS and delivered to Customer. Unless any such renewal is accompanied by a proposed change in the terms of the WCMA Line of Credit (other than the extension of the Maturity Date), no such renewal shall require Customer's approval. Customer shall, however, have the right to terminate the WCMA Line of Credit at any time upon written notice to MLBFS.

(k) **Line Fees.** (i) In consideration of the extension of the WCMA Line of Credit by MLBFS to Customer during the period from the Activation Date to the Initial Maturity Date, Customer has paid or shall pay the Line Fee to MLBFS. If the Line Fee has not heretofore been paid by Customer, Customer hereby authorizes MLBFS, at its option, to either cause the Line Fee to be paid on the Activation Date with a WCMA Loan, or invoice Customer for such Line Fee (in which event Customer shall pay said fee within 5 Business Days after receipt of such invoice). No delay in the Activation Date, howsoever caused, shall entitle Customer to any rebate or reduction in the Line Fee or to any extension of the Initial Maturity Date.

(ii) Customer shall pay an additional Line Fee for each Renewal Year. In connection therewith, Customer hereby authorizes MLBFS, at its option, to either cause each such additional Line Fee to be paid with a WCMA Loan on or at any time after the first Business Day of such Renewal Year or invoiced to Customer at such time (in which event Customer shall pay such Line Fee within 5 Business Days after receipt of such invoice). Each Line Fee shall be deemed fully earned by MLBFS on the date payable by Customer, and no termination of the WCMA Line of Credit, howsoever caused, shall entitle Customer to any rebate or refund of any portion of such Line Fee; provided, however, that if Customer shall terminate the WCMA Line of Credit not later than 5 Business Days after the receipt by Customer of notice from MLBFS of a renewal of the WCMA Line of Credit, Customer shall be entitled to a refund of any Line Fee charged by MLBFS for the ensuing Renewal Year.

**Article III. GENERAL PROVISIONS**

**3.1 REPRESENTATIONS AND WARRANTIES**

Customer represents and warrants to MLBFS that:

(a) **Organization and Existence.** Customer is a corporation, duly organized and validly existing in good standing under the laws of the State of New York and is qualified to do business and in good standing in each other state where the nature of its business or the property owned by it make such qualification necessary; and, where applicable, each Business Guarantor is duly organized, validly existing and in good standing under the laws of the state of its formation and is qualified to do business and in good standing in each other state where the nature of its business or the property owned by it make such qualification necessary.

(b) **Execution, Delivery and Performance.** The execution, delivery and performance by Customer of this Loan Agreement and by Customer and each Guarantor of such of the Additional Agreements to which it is a party: (i) have been duly authorized by all requisite action, (ii) do not and will not violate or conflict with any law or other governmental requirement, or any of the agreements, instruments or documents which formed or govern Customer or any such Guarantor, and (iii) do not and will not breach or violate any of the provisions of, and will not result in a default by Customer or any such Guarantor under, any other agreement, instrument or document to which it is a party or by which it or its properties are bound.

(c) **Notices and Approvals.** Except as may have been given or obtained, no notice to or consent or approval of any governmental body or authority or other third party whatsoever (including, without limitation, any other creditor) is required in connection with the execution, delivery or performance by Customer or any Guarantor of such of this Loan Agreement and the Additional Agreements to which it is a party.

(d) **Enforceability.** This Loan Agreement and such of the Additional Agreements to which Customer or any Guarantor is a party are the respective legal, valid and binding obligations of Customer and such Guarantor, enforceable against it or them, as the case may be, in accordance with their respective terms, except as enforceability may be limited by bankruptcy and other similar laws affecting the rights of creditors generally or by general principles of equity.

-4-

(e) **Collateral.** Except for any Permitted Liens: (i) Customer has good and marketable title to the Collateral, (ii) none of the Collateral is subject to any lien, encumbrance or security interest, and (iii) upon the filing of all Uniform Commercial Code financing statements executed by Customer with respect to the Collateral in the appropriate jurisdiction(s) and/or the completion of any other action required by applicable law to perfect its liens and security interests, MLBFS will have valid and perfected first liens and security interests upon all of the Collateral.

(f) **Financial Statements.** Except as expressly set forth in Customer's or any Business Guarantor's financial statements, all financial statements of Customer and each Business Guarantor furnished to MLBFS have been prepared in conformity with generally accepted accounting principles, consistently applied, are true and correct in all material respects, and fairly present the financial condition of it as at such dates and the results of its operations for the periods then ended (subject, in the case of interim unaudited financial statements, to normal year-end adjustments); and since the most recent date covered by such financial statements, there has been no material adverse change in any such financial condition or operation. All financial statements furnished to MLBFS of any Guarantor other than a Business Guarantor are true and correct in all material respects and fairly represent such Guarantor's financial condition as of the date of such financial statements, and since the most recent date of such financial statements, there has been no material adverse change in such financial condition.

(g) **Litigation.** No litigation, arbitration, administrative or governmental proceedings are pending or, to the knowledge of Customer, threatened against Customer or any Guarantor, which would, if adversely determined, materially and adversely affect the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any such Guarantor or the continued operations of Customer or any Business Guarantor.

(h) **Tax Returns.** All federal, state and local tax returns, reports and statements required to be filed by Customer and each Guarantor have been filed with the appropriate governmental agencies and all taxes due and payable by Customer and each Guarantor have been timely paid (except to the extent that any such failure to file or pay will not materially and adversely affect either the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any Guarantor, or the continued operations of Customer or any Business Guarantor).

(i) **Collateral Location.** All of the tangible Collateral is located at a Location of Tangible Collateral.

(j) **No Outside Broker.** Except for employees of MLBFS, MLPF&S or one of their affiliates, Customer has not in connection with the transactions contemplated hereby directly or indirectly engaged or dealt with, and was not introduced or referred to MLBFS by, any broker or other loan arranger.

Each of the foregoing representations and warranties: (i) has been and will be relied upon as an inducement to MLBFS to provide the WCMA Line of Credit, and (ii) is continuing and shall be deemed remade by Customer concurrently with each request for a WCMA Loan.

## 3.2 FINANCIAL AND OTHER INFORMATION

(a) Customer shall furnish or cause to be furnished to MLBFS during the term of this Loan Agreement all of the following:

(i) **Annual Financial Statements.** Within 120 days after the close of each fiscal year of Customer, a copy of the annual reviewed financial statements of Customer and the annual reviewed financial statements of each Business Guarantor, including, in each case, in reasonable detail, a balance sheet and statement of retained earnings as at the close of such fiscal year and statements of profit and loss and cash flow for such fiscal year;

(ii) **Interim Financial Statements.** Within 45 days after the close of each fiscal quarter of Customer, a copy of the interim financial statements of Customer and each Business Guarantor for such fiscal quarter (including in reasonable detail both a balance sheet as of the close of such fiscal period, and statement of profit and loss for the applicable fiscal period);

(iii) **A/R Agings.** Within 45 days after the close of each fiscal quarter of Customer, a copy of the Accounts Receivable Aging of Customer and each Business Guarantor as of the end of such fiscal quarter;

(iv) **Personal Financial Statements.** Not later than 120 days after the close of each fiscal year of Customer, a current signed financial statement of each individual Guarantor; and

(v) **Other Information.** Such other information as MLBFS may from time to time reasonably request relating to Customer, any Guarantor or the Collateral.

(b) **General Agreements With Respect to Financial Information.** Customer agrees that except as otherwise specified herein or otherwise agreed to in writing by MLBFS: (i) all annual financial statements required to be furnished by Customer to MLBFS hereunder will be prepared by either the current independent accountants for Customer or other independent accountants reasonably acceptable to MLBFS, and (ii) all other financial information required to be furnished by Customer to MLBFS hereunder will be certified as correct in all material respects by the party who has prepared such information, and, in the case of internally prepared information with respect to Customer or any Business Guarantor, certified as correct by their respective chief financial officer.

## 3.3 OTHER COVENANTS

Customer further covenants and agrees during the term of this Loan Agreement that:

(a) **Financial Records; Inspection.** Customer and each Business Guarantor will: (i) maintain at its principal place of business complete and accurate books and records, and maintain all of its financial records in a manner consistent with the financial statements heretofore furnished to MLBFS, or prepared on such other basis as may be approved in writing by MLBFS; and (ii) permit MLBFS or its duly authorized representatives, upon reasonable notice and at reasonable times, to inspect its properties (both real and personal), operations, books and records.

(b) **Taxes.** Customer and each Guarantor will pay when due all taxes, assessments and other governmental charges, howsoever designated, and all other liabilities and obligations, except to the extent that any such failure to pay will not materially and adversely affect either the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any Guarantor or the continued operations of Customer or any Business Guarantor.

(c) **Compliance With Laws and Agreements.** Neither Customer nor any Guarantor will violate any law, regulation or other governmental requirement, any judgment or order of any court or governmental agency or authority, or any agreement, instrument or document to which it is a party or by which it is bound, if any such violation will materially and adversely affect either the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any Guarantor, or the continued operations of Customer or any Business Guarantor.

(d) **No Use of Merrill Lynch Name.** Except upon the prior written consent of MLBFS, neither Customer nor any Guarantor will directly or indirectly publish, disclose or otherwise use in any advertising or promotional material, or press release or interview, the name, logo or any trademark of MLBFS, MLPF&S, Merrill Lynch and Co., Incorporated or any of their affiliates.

(e) **Notification By Customer.** Customer shall provide MLBFS with prompt written notification of: (i) any Default; (ii) any materially adverse change in the business, financial condition or operations of Customer or any Business Guarantor; (iii) any information which indicates that any financial statements of Customer or any Guarantor fail in any material respect to present fairly the financial condition and results of operations purported to be presented in such statements; and (iv) any change in Customer's outside accountants. Each notification by Customer pursuant hereto shall specify the event or information causing such notification, and, to the extent applicable, shall specify the steps being taken to rectify or remedy such event or information.

(f) **Notice of Change.** Customer shall give MLBFS not less than 30 days prior written notice of any change in the name (including any fictitious name) or principal place of business or residence of Customer or any Guarantor.

(g) **Continuity.** Except upon the prior written consent of MLBFS, which consent will not be unreasonably withheld: (i) neither Customer nor any Business Guarantor shall be a party to any merger or consolidation with, or purchase or otherwise acquire all or substantially all of the assets of, or any material stock, partnership, joint venture or other equity interest in, any person or entity, or sell, transfer or lease all or any substantial part of its assets, if any such action would result in either: (A) a material change in the principal business, ownership or control of Customer or such Business Guarantor, or (B) a material adverse change in the financial condition or operations of Customer or such Business Guarantor; (ii) Customer and each Business Guarantor shall preserve their respective existence and good standing in the jurisdiction(s) of establishment and operation; (iii) neither Customer nor any Business Guarantor shall engage in any material business substantially different from their respective business in effect as of the date of application by Customer for credit from MLBFS, or cease operating any such material business; (iv) neither Customer nor any Business Guarantor shall cause or permit any other person or entity to assume or succeed to any material business or operations of Customer or such Business Guarantor; and (v) neither Customer nor any Business Guarantor shall cause or permit any material change in its controlling ownership.

**Minimum Tangible Net Worth.** As of December 31, 2000, Customer's and Business Guarantor's aggregate "tangible net worth" shall exceed $450,000.00. After December 31, 2000, and as of the close of each fiscal year of Customer thereafter, Customer's and Business Guarantor's aggregate "tangible net worth" shall be not less than $100,000.00 higher than the aggregate tangible net worth of Customer and Business Guarantor required hereunder as of the close of the immediately preceding fiscal year of Customer and Business Guarantor (so that as of December 31, 2001, such tangible net worth shall be not less than $550,000.00 as of December 31, 2002, such tangible net worth shall be not less than $650,000.00, etc.). For the purposes hereof, the term "tangible net worth" shall mean Customer's and Business Guarantor's net worth as shown on their regular financial statements prepared in a manner consistent with the terms hereof, but excluding an amount equal to: (i) any assets which are ordinarily classified as "intangible" in accordance with generally accepted accounting principles, and (ii) any amounts now or hereafter directly or indirectly owing to Customer or Business Guarantor by officers, shareholders or affiliates of Customer or Business Guarantor.

(h) **Debt to Tangible Net Worth.** As of December 31, 2000, the ratio of Customer's and Business Guarantor's total debt to Customer's and Business Guarantor's aggregate tangible net worth, determined as aforesaid, shall not at any time exceed 4.5 to 1.

## 3.4 COLLATERAL

(a) **Pledge of Collateral.** To secure payment and performance of the Obligations, Customer hereby pledges, assigns, transfers and sets over to MLBFS, and grants to MLBFS first liens and security interests in and upon all of the Collateral, subject only to Permitted Liens.

(b) **Liens.** Except upon the prior written consent of MLBFS, Customer shall not create or permit to exist any lien, encumbrance or security interest upon or with respect to any Collateral now owned or hereafter acquired other than Permitted Liens.

(c) **Performance of Obligations.** Customer shall perform all of its obligations owing on account of or with respect to the Collateral; it being understood that nothing herein, and no action or inaction by MLBFS, under this Loan Agreement or otherwise, shall be deemed an assumption by MLBFS of any of Customer's said obligations.

(d) **Sales and Collections.** So long as no Event of Default shall have occurred and be continuing, Customer may in the ordinary course of its business: (i) sell any inventory normally held by Customer for sale, (ii) use or consume any materials and supplies normally held by Customer for use or consumption, and (iii) collect all of its Accounts. Customer shall take such action with respect to protection of its inventory and the other Collateral and the collection of its Accounts as MLBFS may from time to time reasonably request.

(e) **Account Schedules.** Upon the request of MLBFS, made now or at any reasonable time or times hereafter, Customer shall deliver to MLBFS, in addition to the other information required hereunder, a schedule identifying, for each Account and all Chattel Paper subject to MLBFS' security interests hereunder, each Account Debtor by name and address and amount, invoice or contract number and date of each invoice or contract. Customer shall furnish

to MLBFS such additional information with respect to the Collateral, and amounts received by Customer as proceeds of any of the Collateral, as MLBFS may from time to time reasonably request.

(f)   **Alterations and Maintenance.** Except upon the prior written consent of MLBFS, Customer shall not make or permit any material alterations to any tangible Collateral which might materially reduce or impair its market value or utility. Customer shall at all times keep the tangible Collateral in good condition and repair, reasonable wear and tear excepted, and shall pay or cause to be paid all obligations arising from the repair and maintenance of such Collateral, as well as all obligations with respect to any Location of Tangible Collateral, except for any such obligations being contested by Customer in good faith by appropriate proceedings.

(g)   **Location.** Except for movements required in the ordinary course of Customer's business, Customer shall give MLBFS 30 days' prior written notice of the placing at or movement of any tangible Collateral to any location other than a Location of Tangible Collateral. In no event shall Customer cause or permit any material tangible Collateral to be removed from the United States without the express prior written consent of MLBFS.

(h)   **Insurance.** Customer shall insure all of the tangible Collateral under a policy or policies of physical damage insurance providing that losses will be payable to MLBFS as its interests may appear pursuant to a Lender's Loss Payable Endorsement and containing such other provisions as may be reasonably required by MLBFS. Customer shall further provide and maintain a policy or policies of comprehensive public liability insurance naming MLBFS as an additional party insured. Customer and each Business Guarantor shall maintain such other insurance as may be required by law or is customarily maintained by companies in a similar business or otherwise reasonably required by MLBFS. All such insurance policies shall provide that MLBFS will receive not less than 10 days prior written notice of any cancellation, and shall otherwise be in form and amount and with an insurer or insurers reasonably acceptable to MLBFS. Customer shall furnish MLBFS with a copy or certificate of each such policy or policies and, prior to any expiration or cancellation, each renewal or replacement thereof.

(i)   **Event of Loss.** Customer shall at its expense promptly repair all repairable damage to any tangible Collateral. In the event that any tangible Collateral is damaged beyond repair, lost, totally destroyed or confiscated (an "Event of Loss") and such Collateral had a value prior to such Event of Loss of $25,000.00 or more, then, on or before the first to occur of (i) 90 days after the occurrence of such Event of Loss, or (ii) 10 Business Days after the date on which either Customer or MLBFS shall receive any proceeds of insurance on account of such Event of Loss, or any underwriter of insurance on such Collateral shall advise either Customer or MLBFS that it disclaims liability in respect of such Event of Loss, Customer shall, at Customer's option, either replace the Collateral subject to such Event of Loss with comparable Collateral free of all liens other than Permitted Liens (in which event Customer shall be entitled to utilize the proceeds of insurance on account of such Event of Loss for such purpose, and may retain any excess proceeds of such insurance), or deposit into the WCMA Account an amount equal to the actual cash value of such Collateral as determined by either the insurance company's payment (plus any applicable deductible) or, in absence of insurance company payment, as reasonably determined by MLBFS; it being further understood that any such deposit shall be accompanied by a like permanent reduction in the Maximum WCMA Line of Credit. Notwithstanding the foregoing, if at the time of occurrence of such Event of Loss or any time thereafter prior to replacement or line reduction, as aforesaid, an Event of Default shall have occurred and be continuing hereunder, then MLBFS may at its sole option, exercisable at any time while such Event of Default shall be continuing, require Customer to either replace such Collateral or make a deposit into the WCMA Account and reduce the Maximum WCMA Line of Credit, as aforesaid.

(j)   **Notice of Certain Events.** Customer shall give MLBFS immediate notice of any attachment, lien, judicial process, encumbrance or claim affecting or involving $25,000.00 or more of the Collateral.

(k)   **Indemnification.** Customer shall indemnify, defend and save MLBFS harmless from and against any and all claims, liabilities, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) of any nature whatsoever which may be asserted against or incurred by MLBFS arising out of or in any manner occasioned by (i) the ownership, collection, possession, use or operation of any Collateral, or (ii) any failure by Customer to perform any of its obligations hereunder; excluding, however, from said indemnity any such claims, liabilities, etc. arising directly out of the willful wrongful act or active gross negligence of MLBFS. This indemnity shall survive the expiration or termination of this Loan Agreement as to all matters arising or accruing prior to such expiration or termination.

**3.5 EVENTS OF DEFAULT**

The occurrence of any of the following events shall constitute an "Event of Default" under this Loan Agreement:

(a)   **Exceeding the Maximum WCMA Line of Credit.** If the WCMA Loan Balance shall at any time exceed the Maximum WCMA Line of Credit and Customer shall fail to deposit sufficient funds into the WCMA Account to reduce the WCMA Loan Balance below the Maximum WCMA Line of Credit within five (5) Business Days after written notice thereof shall have been given by MLBFS to Customer.

(b)   **Other Failure to Pay.** Customer shall fail to pay to MLBFS or deposit into the WCMA Account when due any other amount owing or required to be paid or deposited by Customer under this Loan Agreement, or shall fail to pay when due any other Obligations, and any such failure shall continue for more than five (5) Business Days after written notice thereof shall have been given by MLBFS to Customer.

(c)   **Failure to Perform.** Customer or any Guarantor shall default in the performance or observance of any covenant or agreement on its part to be performed or observed under this Loan Agreement or any of the Additional Agreements (not constituting an Event of Default under any other clause of this Section), and such default shall continue unremedied for ten (10) Business Days after written notice thereof shall have been given by MLBFS to Customer.

(d)   **Breach of Warranty.** Any representation or warranty made by Customer or any Guarantor contained in this Loan Agreement or any of the Additional Agreements shall at any time prove to have been incorrect in any material respect when made.

-7-

(e) **Default Under Other Agreement.** A default or Event of Default by Customer or any Guarantor shall occur under the terms of any other agreement, instrument or document with or intended for the benefit of MLBFS, MLPF&S or any of their affiliates, and any required notice shall have been given and required passage of time shall have elapsed.

(f) **Bankruptcy Event.** Any Bankruptcy Event shall occur.

(g) **Material Impairment.** Any event shall occur which shall reasonably cause MLBFS to in good faith believe that the prospect of full payment or performance by Customer or any Guarantor of any of their respective liabilities or obligations under this Loan Agreement or any of the Additional Agreements to which Customer or such Guarantor is a party has been materially impaired. The existence of such a material impairment shall be determined in a manner consistent with the intent of Section 1-208 of the UCC.

(h) **Acceleration of Debt to Other Creditors.** Any event shall occur which results in the acceleration of the maturity of any indebtedness of $100,000.00 or more of Customer or any Guarantor to another creditor under any indenture, agreement, undertaking, or otherwise.

(i) **Seizure or Abuse of Collateral.** The Collateral, or any material part thereof, shall be or become subject to any material abuse or misuse, or any levy, attachment, seizure or confiscation which is not released within ten (10) Business Days.

**3.6 REMEDIES**

(a) **Remedies Upon Default.** Upon the occurrence and during the continuance of any Event of Default, MLBFS may at its sole option do any one or more or all of the following, at such time and in such order as MLBFS may in its sole discretion choose:

(i) **Termination.** MLBFS may without notice terminate the WCMA Line of Credit and all obligations to provide the WCMA Line of Credit or otherwise extend any credit to or for the benefit of Customer (it being understood, however, that upon the occurrence of any Bankruptcy Event the WCMA Line of Credit and all such obligations shall automatically terminate without any action on the part of MLBFS); and upon any such termination MLBFS shall be relieved of all such obligations.

(ii) **Acceleration.** MLBFS may declare the principal of and interest on the WCMA Loan Balance, and all other Obligations to be forthwith due and payable, whereupon all such amounts shall be immediately due and payable, without presentment, demand for payment, protest and notice of protest, notice of dishonor, notice of acceleration, notice of intent to accelerate or other notice or formality of any kind, all of which are hereby expressly waived; provided, however, that upon the occurrence of any Bankruptcy Event all such principal, interest and other Obligations shall automatically become due and payable without any action on the part of MLBFS.

(iii) **Exercise Other Rights.** MLBFS may exercise any or all of the remedies of a secured party under applicable law, including, but not limited to, the UCC, and any or all of its other rights and remedies under this Loan Agreement and the Additional Agreements.

(iv) **Possession.** MLBFS may require Customer to make the Collateral and the records pertaining to the Collateral available to MLBFS at a place designated by MLBFS which is reasonably convenient to Customer, or may take possession of the Collateral and the records pertaining to the Collateral without the use of any judicial process and without any prior notice to Customer.

(v) **Sale.** MLBFS may sell any or all of the Collateral at public or private sale upon such terms and conditions as MLBFS may reasonably deem proper. MLBFS may purchase any Collateral at any such public sale. The net proceeds of any such public or private sale and all other amounts actually collected or received by MLBFS pursuant hereto, after deducting all costs and expenses incurred at any time in the collection of the Obligations and in the protection, collection and sale of the Collateral, will be applied to the payment of the Obligations, with any remaining proceeds paid to Customer or whoever else may be entitled thereto, and with Customer and each Guarantor remaining jointly and severally liable for any amount remaining unpaid after such application.

(vi) **Delivery of Cash, Checks, Etc.** MLBFS may require Customer to forthwith upon receipt, transmit and deliver to MLBFS in the form received, all cash, checks, drafts and other instruments for the payment of money (properly endorsed, where required, so that such items may be collected by MLBFS) which may be received by Customer at any time in full or partial payment of any Collateral, and require that Customer not commingle any such items which may be so received by Customer with any other of its funds or property but instead hold them separate and apart and in trust for MLBFS until delivery is made to MLBFS.

(vii) **Notification of Account Debtors.** MLBFS may notify any Account Debtor that its Account or Chattel Paper has been assigned to MLBFS and direct such Account Debtor to make payment directly to MLBFS of all amounts due or becoming due with respect to such Account or Chattel Paper, and MLBFS may enforce payment and collect, by legal proceedings or otherwise, such Account or Chattel Paper.

(viii) **Control of Collateral.** MLBFS may otherwise take control in any lawful manner of any cash or non-cash items of payment or proceeds of Collateral and of any rejected, returned, stopped in transit or repossessed goods included in the Collateral and endorse Customer's name on any item of payment on or proceeds of the Collateral.

(b) **Set-Off.** MLBFS shall have the further right upon the occurrence and during the continuance of an Event of Default to set-off, appropriate and apply toward payment of any of the Obligations, in such order of application as MLBFS may from time to time and at any time elect, any cash, credit, deposits, accounts, financial assets, investment property, securities and any other property of Customer which is in transit to or in the possession, custody or control of MLBFS, MLPF&S or any agent, bailee, or affiliate of MLBFS or MLPF&S. Customer hereby collaterally assigns and grants to MLBFS a continuing security interest in all such property as additional Collateral.

-8-

(c) **Power of Attorney.** Effective upon the occurrence and during the continuance of an Event of Default, Customer hereby irrevocably appoints MLBFS as its attorney-in-fact, with full power of substitution, in its place and stead and in its name or in the name of MLBFS, to from time to time in MLBFS' sole discretion take any action and to execute any instrument which MLBFS may deem necessary or advisable to accomplish the purposes of this Loan Agreement, including, but not limited to, to receive, endorse and collect all checks, drafts and other instruments for the payment of money made payable to Customer included in the Collateral.

(d) **Remedies are Severable and Cumulative.** All rights and remedies of MLBFS herein are severable and cumulative and in addition to all other rights and remedies available in the Additional Agreements, at law or in equity, and any one or more of such rights and remedies may be exercised simultaneously or successively.

(e) **Notices.** To the fullest extent permitted by applicable law, Customer hereby irrevocably waives and releases MLBFS of and from any and all liabilities and penalties for failure of MLBFS to comply with any statutory or other requirement imposed upon MLBFS relating to notices of sale, holding of sale or reporting of any sale, and Customer waives all rights of redemption or reinstatement from any such sale. Any notices required under applicable law shall be reasonably and properly given to Customer if given by any of the methods provided herein at least 5 Business Days prior to taking action. MLBFS shall have the right to postpone or adjourn any sale or other disposition of Collateral at any time without giving notice of any such postponed or adjourned date. In the event MLBFS seeks to take possession of any or all of the Collateral by court process, Customer further irrevocably waives to the fullest extent permitted by law any bonds and any surety or security relating thereto required by any statute, court rule or otherwise as an incident to such possession, and any demand for possession prior to the commencement of any suit or action.

## 3.7 MISCELLANEOUS

(a) **Non-Waiver.** No failure or delay on the part of MLBFS in exercising any right, power or remedy pursuant to this Loan Agreement or any of the Additional Agreements shall operate as a waiver thereof, and no single or partial exercise of any such right, power or remedy shall preclude any other or further exercise thereof, or the exercise of any other right, power or remedy. Neither any waiver of any provision of this Loan Agreement or any of the Additional Agreements, nor any consent to any departure by Customer therefrom, shall be effective unless the same shall be in writing and signed by MLBFS. Any waiver of any provision of this Loan Agreement or any of the Additional Agreements and any consent to any departure by Customer from the terms of this Loan Agreement or any of the Additional Agreements shall be effective only in the specific instance and for the specific purpose for which given. Except as otherwise expressly provided herein, no notice to or demand on Customer shall in any case entitle Customer to any other or further notice or demand in similar or other circumstances.

(b) **Disclosure.** Customer hereby irrevocably authorizes MLBFS and each of its affiliates, including without limitation MLPF&S, to at any time (whether or not an Event of Default shall have occurred) obtain from and disclose to each other any and all financial and other information about Customer. In connection with said authorization, the parties recognize that in order to provide a WCMA Line of Credit certain information about Customer is required to be made available on a computer network accessible by certain affiliates of MLBFS, including MLPF&S.

(c) **Communications.** All notices and other communications required or permitted hereunder shall be in writing, and shall be either delivered personally, mailed by postage prepaid certified mail or sent by express overnight courier or by facsimile. Such notices and communications shall be deemed to be given on the date of personal delivery, facsimile transmission or actual delivery of certified mail, or one Business Day after delivery to an express overnight courier. Unless otherwise specified in a notice sent or delivered in accordance with the terms hereof, notices and other communications in writing shall be given to the parties hereto at their respective addresses set forth at the beginning of this Loan Agreement, or, in the case of facsimile transmission, to the parties at their respective regular facsimile telephone number.

(d) **Fees, Expenses and Taxes.** Customer shall pay or reimburse MLBFS for: (i) all Uniform Commercial Code filing and search fees and expenses incurred by MLBFS in connection with the verification, perfection or preservation of MLBFS' rights hereunder or in the Collateral or any other collateral for the Obligations; (ii) any and all stamp, transfer and other taxes and fees payable or determined to be payable in connection with the execution, delivery and/or recording of this Loan Agreement or any of the Additional Agreements; and (iii) all reasonable fees and out-of-pocket expenses (including, but not limited to, reasonable fees and expenses of outside counsel) incurred by MLBFS in connection with the collection of any sum payable hereunder or under any of the Additional Agreements not paid when due, the enforcement of this Loan Agreement or any of the Additional Agreements and the protection of MLBFS' rights hereunder or thereunder, excluding, however, salaries and normal overhead attributable to MLBFS' employees. Customer hereby authorizes MLBFS, at its option, to either cause any and all such fees, expenses and taxes to be paid with a WCMA Loan, or invoice Customer therefor (in which event Customer shall pay all such fees, expenses and taxes within 5 Business Days after receipt of such invoice). The obligations of Customer under this paragraph shall survive the expiration or termination of this Loan Agreement and the discharge of the other Obligations.

(e) **Right to Perform Obligations.** If Customer shall fail to do any act or thing which it has covenanted to do under this Loan Agreement or any representation or warranty on the part of Customer contained in this Loan Agreement shall be breached, MLBFS may, in its sole discretion, after 5 Business Days written notice is sent to Customer (or such lesser notice, including no notice, as is reasonable under the circumstances), do the same or cause it to be done or remedy any such breach, and may expend its funds for such purpose. Any and all reasonable amounts so expended by MLBFS shall be repayable to MLBFS by Customer upon demand, with interest at the Interest Rate during the period from and including the date funds are so expended by MLBFS to the date of repayment, and all such amounts shall be additional Obligations. The payment or performance by MLBFS of any of Customer's obligations hereunder shall not relieve Customer of said obligations or of the consequences of having failed to pay or perform the same, and shall not waive or be deemed a cure of any Default.

(f) **Further Assurances.** Customer agrees to do such further acts and things and to execute and deliver to MLBFS such additional agreements, instruments and documents as MLBFS may reasonably require or deem advisable to effectuate the purposes of this Loan Agreement or any of the Additional Agreements, or to establish, perfect and maintain MLBFS' security interests and liens upon the Collateral, including, but not limited to: (i) executing financing

statements or amendments thereto when and as reasonably requested by MLBFS; and (ii) if in the reasonable judgment of MLBFS it is required by local law, causing the owners and/or mortgagees of the real property on which any Collateral may be located to execute and deliver to MLBFS waivers or subordinations reasonably satisfactory to MLBFS with respect to any rights in such Collateral.

(g) **Binding Effect.** This Loan Agreement and the Additional Agreements shall be binding upon, and shall inure to the benefit of MLBFS, Customer and their respective successors and assigns. Customer shall not assign any of its rights or delegate any of its obligations under this Loan Agreement or any of the Additional Agreements without the prior written consent of MLBFS. Unless otherwise expressly agreed to in a writing signed by MLBFS, no such consent shall in any event relieve Customer of any of its obligations under this Loan Agreement or the Additional Agreements.

(h) **Headings.** Captions and section and paragraph headings in this Loan Agreement are inserted only as a matter of convenience, and shall not affect the interpretation hereof.

(i) **Governing Law.** This Loan Agreement, and, unless otherwise expressly provided therein, each of the Additional Agreements, shall be governed in all respects by the laws of the State of Illinois.

(j) **Severability of Provisions.** Whenever possible, each provision of this Loan Agreement and the Additional Agreements shall be interpreted in such manner as to be effective and valid under applicable law. Any provision of this Loan Agreement or any of the Additional Agreements which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Loan Agreement and the Additional Agreements or affecting the validity or enforceability of such provision in any other jurisdiction.

(k) **Term.** This Loan Agreement shall become effective on the date accepted by MLBFS at its office in Chicago, Illinois, and, subject to the terms hereof, shall continue in effect so long thereafter as the WCMA Line of Credit shall be in effect or there shall be any Obligations outstanding.

(l) **Counterparts.** This Loan Agreement may be executed in one or more counterparts which, when taken together, constitute one and the same agreement.

(m) **Jurisdiction; Waiver.** CUSTOMER ACKNOWLEDGES THAT THIS LOAN AGREEMENT IS BEING ACCEPTED BY MLBFS IN PARTIAL CONSIDERATION OF MLBFS' RIGHT AND OPTION, IN ITS SOLE DISCRETION, TO ENFORCE THIS LOAN AGREEMENT (INCLUDING THE WCMA NOTE SET FORTH HEREIN) AND THE ADDITIONAL AGREEMENTS IN EITHER THE STATE OF ILLINOIS OR IN ANY OTHER JURISDICTION WHERE CUSTOMER OR ANY COLLATERAL FOR THE OBLIGATIONS MAY BE LOCATED. CUSTOMER IRREVOCABLY SUBMITS ITSELF TO JURISDICTION IN THE STATE OF ILLINOIS AND VENUE IN ANY STATE OR FEDERAL COURT IN THE COUNTY OF COOK FOR SUCH PURPOSES, AND CUSTOMER WAIVES ANY AND ALL RIGHTS TO CONTEST SAID JURISDICTION AND VENUE AND THE CONVENIENCE OF ANY SUCH FORUM, AND ANY AND ALL RIGHTS TO REMOVE SUCH ACTION FROM STATE TO FEDERAL COURT. CUSTOMER FURTHER WAIVES ANY RIGHTS TO COMMENCE ANY ACTION AGAINST MLBFS IN ANY JURISDICTION EXCEPT IN THE COUNTY OF COOK AND STATE OF ILLINOIS. MLBFS AND CUSTOMER HEREBY EACH EXPRESSLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES AGAINST THE OTHER PARTY WITH RESPECT TO ANY MATTER RELATING TO, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE WCMA LINE OF CREDIT, THIS LOAN AGREEMENT, ANY ADDITIONAL AGREEMENTS AND/OR ANY OF THE TRANSACTIONS WHICH ARE THE SUBJECT MATTER OF THIS LOAN AGREEMENT. CUSTOMER FURTHER WAIVES THE RIGHT TO BRING ANY NON-COMPULSORY COUNTERCLAIMS.

(n) **Integration.** THIS LOAN AGREEMENT, TOGETHER WITH THE ADDITIONAL AGREEMENTS, CONSTITUTES THE ENTIRE UNDERSTANDING AND REPRESENTS THE FULL AND FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR WRITTEN AGREEMENTS OR PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS OF THE PARTIES. WITHOUT LIMITING THE FOREGOING, CUSTOMER ACKNOWLEDGES THAT EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN: (i) NO PROMISE OR COMMITMENT HAS BEEN MADE TO IT BY MLBFS, MLPF&S OR ANY OF THEIR RESPECTIVE EMPLOYEES, AGENTS OR REPRESENTATIVES TO EXTEND THE AVAILABILITY OF THE WCMA LINE OF CREDIT OR THE MATURITY DATE, OR TO INCREASE THE MAXIMUM WCMA LINE OF CREDIT, OR OTHERWISE EXTEND ANY OTHER CREDIT TO CUSTOMER OR ANY OTHER PARTY; (ii) NO PURPORTED EXTENSION OF THE MATURITY DATE, INCREASE IN THE MAXIMUM WCMA LINE OF CREDIT OR OTHER EXTENSION OR AGREEMENT TO EXTEND CREDIT SHALL BE VALID OR BINDING UNLESS EXPRESSLY SET FORTH IN A WRITTEN INSTRUMENT SIGNED BY MLBFS; AND (iii) THIS LOAN AGREEMENT SUPERSEDES AND REPLACES ANY AND ALL PROPOSALS, LETTERS OF INTENT AND APPROVAL AND COMMITMENT LETTERS FROM MLBFS TO CUSTOMER, NONE OF WHICH SHALL BE CONSIDERED AN ADDITIONAL AGREEMENT. NO AMENDMENT OR MODIFICATION OF THIS AGREEMENT OR ANY OF THE ADDITIONAL AGREEMENTS TO WHICH CUSTOMER IS A PARTY SHALL BE EFFECTIVE UNLESS IN A WRITING SIGNED BY BOTH MLBFS AND CUSTOMER.

IN WITNESS WHEREOF, this Loan Agreement has been executed as of the day and year first above written.

**ADDRESSING SYSTEMS AND PRODUCTS, INC.**

By: _____        x _____
         Signature (1)                      Signature (2)

x _MARSHALL GARBERG_____       x _____
         Printed Name                        Printed Name

x _PRESIDENT_____       x _____
             Title                                  Title


Accepted at Chicago, Illinois:
**MERRILL LYNCH BUSINESS FINANCIAL
SERVICES INC.**

By: _Jennifer Corken_____

## EXHIBIT A

**ATTACHED TO AND HEREBY MADE A PART OF WCMA LOAN AND SECURITY AGREEMENT NO. 879-07D04 BETWEEN MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC. AND ADDRESSING SYSTEMS AND PRODUCTS, INC.**

**Additional Locations of Tangible Collateral:**

**EXHIBIT B**

**Merrill Lynch**                                                    UNCONDITIONAL GUARANTY

FOR VALUE RECEIVED, and in order to induce MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC. ("MLBFS") to advance moneys or extend or continue to extend credit or lease property to or for the benefit of, or modify its credit relationship with, or enter into any other financial accommodations with ADDRESSING SYSTEMS AND PRODUCTS, INC., a corporation organized and existing under the laws of the State of New York (with any successor in interest, including, without limitation, any successor by merger or by operation of law, herein collectively referred to as "Customer") under: (a) that certain WCMA LOAN AND SECURITY AGREEMENT NO. 879-07D04 between MLBFS and Customer (the "Loan Agreement"), (b) any "Additional Agreements", as that term is defined in the Loan Agreement, and (c) all present and future amendments, restatements, supplements and other evidences of any extensions, increases, renewals, modifications and other changes of or to the Loan Agreement or any Additional Agreements) (collectively, the "Guaranteed Documents"), the undersigned ("Guarantor") hereby unconditionally guarantees to MLBFS: (i) the prompt and full payment when due, by acceleration or otherwise, of all sums now or any time hereafter due from Customer to MLBFS under the Guaranteed Documents, (ii) the prompt, full and faithful performance and discharge by Customer of each and every other covenant and warranty of Customer set forth in the Guaranteed Documents, and (iii) the prompt and full payment and performance of all other indebtedness, liabilities and obligations of Customer to MLBFS, howsoever created or evidenced, and whether now existing or hereafter arising (collectively, the "Obligations"). Guarantor further agrees to pay all reasonable costs and expenses (including, but not limited to, court costs and reasonable attorneys' fees) paid or incurred by MLBFS in endeavoring to collect or enforce performance of any of the Obligations, or in enforcing this Guaranty. Guarantor acknowledges that MLBFS is relying on the execution and delivery of this Guaranty in advancing moneys to or extending or continuing to extend credit to or for the benefit of Customer.

This Guaranty is absolute, unconditional and continuing and shall remain in effect until all of the Obligations shall have been fully and indefeasibly paid, performed and discharged. Upon the occurrence and during the continuance of any default or Event of Default under any of the Guaranteed Documents, any or all of the indebtedness hereby guaranteed then existing shall, at the option of MLBFS, become immediately due and payable from Guarantor (it being understood, however, that upon the occurrence of any "Bankruptcy Event", as defined in the Loan Agreement, all such indebtedness shall automatically become due and payable without action on the part of MLBFS). Notwithstanding the occurrence of any such event, this Guaranty shall continue and remain in full force and effect. To the extent MLBFS receives payment with respect to the Obligations, and all or any part of such payment is subsequently invalidated, declared to be fraudulent or preferential, set aside, required to be repaid by MLBFS or is repaid by MLBFS pursuant to a settlement agreement, to a trustee, receiver or any other person or entity, whether under any Bankruptcy law or otherwise (a "Returned Payment"), this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of such payment or repayment by MLBFS, and the indebtedness or part thereof intended to be satisfied by such Returned Payment shall be revived and continued in full force and effect as if said Returned Payment had not been made.

The liability of Guarantor hereunder shall in no event be affected or impaired by any of the following, any of which may be done or omitted by MLBFS from time to time, without notice to or the consent of Guarantor: (a) any renewals, amendments, modifications or supplements of or to any of the Guaranteed Documents, or any extensions, forbearances, compromises or releases of any of the Obligations or any of MLBFS' rights under any of the Guaranteed Documents; (b) any acceptance by MLBFS of any collateral or security for, or other guarantees of, any of the Obligations; (c) any failure, neglect or omission on the part of MLBFS to realize upon or protect any of the Obligations, or any collateral or security therefor, or to exercise any lien upon or right of appropriation of any moneys, credits or property of Customer or any other guarantor, possessed by or under the control of MLBFS or any of its affiliates, toward the liquidation or reduction of the Obligations; (d) any invalidity, irregularity or unenforceability of all or any part of the Obligations, of any collateral security for the Obligations, or the Guaranteed Documents; (e) any application of payments or credits by MLBFS; (f) the granting of credit from time to time by MLBFS to Customer in excess of the amount set forth in the Guaranteed Documents; or (g) any other act of commission or omission of any kind or at any time upon the part of MLBFS or any of its affiliates or any of their respective employees or agents with respect to any matter whatsoever. MLBFS shall not be required at any time, as a condition of Guarantor's obligations hereunder, to resort to payment from Customer or other persons or entities whatsoever, or any of their properties or estates, or resort to any collateral or pursue or exhaust any other rights or remedies whatsoever.

No release or discharge in whole or in part of any other guarantor of the Obligations shall release or discharge Guarantor or any other guarantor, unless and until all of the Obligations shall have been indefeasibly fully paid and discharged. Guarantor expressly waives presentment, protest, demand, notice of dishonor or default, notice of acceptance of this Guaranty, notice of advancement of funds under the Guaranteed Documents and all other notices and formalities to which Customer or Guarantor might be entitled, by statute or otherwise, and, so long as there are any Obligations or MLBFS is committed to extend credit to Customer, Guarantor waives any right to revoke or terminate this Guaranty without the express written consent of MLBFS.

So long as there are any Obligations, Guarantor shall not have any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right, or remedy of MLBFS against Customer or any security which MLBFS now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law, or otherwise.

MLBFS is hereby irrevocably authorized by Guarantor at any time during the continuance of an Event of Default under the Loan Agreement or any other of the Guaranteed Documents or in respect of any of the Obligations, in its sole discretion and without demand or notice of any kind, to appropriate, hold, set off and apply toward the payment of any amount due hereunder, in such order of application as MLBFS may elect, all cash, credits, deposits, accounts, financial assets, investment property, securities and any other property of Guarantor which is in transit to or in the possession, custody or control of MLBFS or Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S"), or any of their respective agents, bailees or affiliates. Guarantor hereby collaterally assigns and grants to MLBFS a continuing security interest in all such property as additional security for the Obligations. Upon the occurrence and during the continuance of an Event of Default, MLBFS shall have all rights in such property available to collateral assignees and secured parties under all applicable laws, including, without limitation, the Uniform Commercial Code.

Guarantor agrees to furnish to MLBFS such financial information concerning Guarantor as may be required by any of the Guaranteed Documents or as MLBFS may otherwise from time to time reasonably request. Guarantor further hereby irrevocably authorizes MLBFS and each of its affiliates, including without limitation MLPF&S, to at any time (whether or not an Event of Default shall have occurred) obtain from and disclose to each other any and all financial and other information about Guarantor.

Guarantor warrants and agrees that: (a) unless clearly stated or noted, no material assets shown on any financial statements of Guarantor heretofore or hereafter furnished to MLBFS are or will be held in an irrevocable trust, pension trust, retirement trust, IRA or other trust or form of ownership exempt from execution by creditors of Guarantor; and, (b) except upon the prior written consent of MLBFS, which consent will not be unreasonably withheld, Guarantor will not hereafter transfer any material assets of Guarantor to any trust or third party if the effect thereof will be to cause such assets to be exempt from execution by creditors of Guarantor (excluding, however, normal and reasonable contributions to pension plans, retirement plans, etc., and IRA rollovers).

No delay on the part of MLBFS in the exercise of any right or remedy under any of the Guaranteed Documents, this Guaranty or any other agreement shall operate as a waiver thereof, and, without limiting the foregoing, no delay in the enforcement of any security interest, and no single or partial exercise by MLBFS of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy. This Guaranty may be executed in any number of counterparts, each of which counterparts, once they are executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Guaranty. This Guaranty shall be binding upon Guarantor and Guarantor's heirs and personal representatives, and shall inure to the benefit of MLBFS and its successors and assigns.

This Guaranty shall be governed by the laws of the State of Illinois. WITHOUT LIMITING THE RIGHT OF MLBFS TO ENFORCE THIS GUARANTY IN ANY JURISDICTION AND VENUE PERMITTED BY APPLICABLE LAW: (i) GUARANTOR AGREES THAT THIS GUARANTY MAY AT THE OPTION OF MLBFS BE ENFORCED BY MLBFS IN EITHER THE STATE OF ILLINOIS OR IN ANY OTHER JURISDICTION WHERE ANY GUARANTOR, CUSTOMER OR ANY COLLATERAL FOR THE OBLIGATIONS OF CUSTOMER MAY BE LOCATED, (ii) GUARANTOR IRREVOCABLY SUBMITS TO JURISDICTION IN THE STATE OF ILLINOIS AND VENUE IN ANY STATE OR FEDERAL COURT IN THE COUNTY OF COOK FOR SUCH PURPOSES, AND (iii) GUARANTOR WAIVES ANY AND ALL RIGHTS TO CONTEST SAID JURISDICTION AND VENUE AND THE CONVENIENCE OF ANY SUCH FORUM AND ANY AND ALL RIGHTS TO REMOVE SUCH ACTION FROM STATE TO FEDERAL COURT. GUARANTOR FURTHER WAIVES ANY RIGHTS TO COMMENCE ANY ACTION AGAINST MLBFS IN ANY JURISDICTION EXCEPT IN THE COUNTY OF COOK AND STATE OF ILLINOIS. MLBFS AND GUARANTOR HEREBY EACH EXPRESSLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES AGAINST THE OTHER PARTY WITH RESPECT TO ANY MATTER RELATING TO, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS GUARANTY AND/OR ANY OF THE TRANSACTIONS WHICH ARE THE SUBJECT MATTER OF THIS GUARANTY. GUARANTOR FURTHER WAIVES THE RIGHT TO BRING ANY NON-COMPULSORY COUNTERCLAIMS. Wherever possible each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty. No modification or waiver of any of the provisions of this Guaranty shall be effective unless in writing and signed by Guarantors and an officer of MLBFS.

Dated as of July 24, 2000.

Guarantor:

MARSHALL GOLDBERG

Witness:

Printed Name: DAVID BLUMENTHAL

Address:

14 East Hill Court
Tenafly, NJ 07670

 **Merrill Lynch**

**UNCONDITIONAL GUARANTY**

FOR VALUE RECEIVED, and in order to induce MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC. ("MLBFS") to advance moneys or extend or continue to extend credit or lease property to or for the benefit of, or modify its credit relationship with, or enter into any other financial accommodations with ADDRESSING SYSTEMS AND PRODUCTS, INC., a corporation organized and existing under the laws of the State of New York (with any successor in interest, including, without limitation, any successor by merger or by operation of law, herein collectively referred to as "Customer") under: (a) that certain WCMA LOAN AND SECURITY AGREEMENT NO. 879-07D04 between MLBFS and Customer (the "Loan Agreement"), (b) any "Additional Agreements", as that term is defined in the Loan Agreement, and (c) all present and future amendments, restatements, supplements and other evidences of any extensions, increases, renewals, modifications and other changes of or to the Loan Agreement or any Additional Agreements) (collectively, the "Guaranteed Documents"), and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, TEMAR INC., a corporation organized and existing under the laws of the State of New Jersey ("Guarantor"), hereby unconditionally guarantees to MLBFS: (i) the prompt and full payment when due, by acceleration or otherwise, of all sums now or any time hereafter due from Customer to MLBFS under the Guaranteed Documents, (ii) the prompt, full and faithful performance and discharge by Customer of each and every other covenant and warranty of Customer set forth in the Guaranteed Documents, and (iii) the prompt and full payment and performance of all other indebtedness, liabilities and obligations of Customer to MLBFS, howsoever created or evidenced, and whether now existing or hereafter arising (collectively, the "Obligations"). Guarantor further agrees to pay all reasonable costs and expenses (including, but not limited to, court costs and reasonable attorneys' fees) paid or incurred by MLBFS in endeavoring to collect or enforce performance of any of the Obligations, or in enforcing this Guaranty. Guarantor acknowledges that MLBFS is relying on the execution and delivery of this Guaranty in advancing moneys to or extending or continuing to extend credit to or for the benefit of Customer.

This Guaranty is absolute, unconditional and continuing and shall remain in effect until all of the Obligations shall have been fully and indefeasibly paid, performed and discharged. Upon the occurrence and during the continuance of any default or Event of Default under any of the Guaranteed Documents, any or all of the indebtedness hereby guaranteed then existing shall, at the option of MLBFS, become immediately due and payable from Guarantor (it being understood, however, that upon the occurrence of any "Bankruptcy Event", as defined in the Loan Agreement, all such indebtedness shall automatically become due and payable without action on the part of MLBFS). Notwithstanding the occurrence of any such event, this Guaranty shall continue and remain in full force and effect. To the extent MLBFS receives payment with respect to the Obligations, and all or any part of such payment is subsequently invalidated, declared to be fraudulent or preferential, set aside, required to be repaid by MLBFS or is repaid by MLBFS pursuant to a settlement agreement, to a trustee, receiver or any other person or entity, whether under any Bankruptcy law or otherwise (a "Returned Payment"), this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of such payment or repayment by MLBFS, and the indebtedness or part thereof intended to be satisfied by such Returned Payment shall be revived and continued in full force and effect as if said Returned Payment had not been made.

The liability of Guarantor hereunder shall in no event be affected or impaired by any of the following, any of which may be done or omitted by MLBFS from time to time, without notice to or the consent of Guarantor: (a) any renewals, amendments, restatements, modifications or supplements of or to any of the Guaranteed Documents, or any extensions, forbearances, compromises or releases of any of the Obligations or any of MLBFS' rights under any of the Guaranteed Documents; (b) any acceptance by MLBFS of any collateral or security for, or other guarantees of, any of the Obligations; (c) any failure, neglect or omission on the part of MLBFS to realize upon or protect any of the Obligations, or any collateral or security therefor, or to exercise any lien upon or right of appropriation of any moneys, credits or property of Customer or any other guarantor, possessed by or under the control of MLBFS or any of its affiliates, toward the liquidation or reduction of the Obligations; (d) any invalidity, irregularity or unenforceability of all or any part of the Obligations, of any collateral security for the Obligations, or the Guaranteed Documents; (e) any application of payments or credits by MLBFS; (f) the granting of credit from time to time by MLBFS to Customer in excess of the amount set forth in the Guaranteed Documents; or (g) any other act of commission or omission of any kind or at any time upon the part of MLBFS or any of its affiliates or any of their respective employees or agents with respect to any matter whatsoever. MLBFS shall not be required at any time, as a condition of Guarantor's obligations hereunder, to resort to payment from Customer or other persons or entities whatsoever, or any of their properties or estates, or resort to any collateral or pursue or exhaust any other rights or remedies whatsoever.

No release or discharge in whole or in part of any other guarantor of the Obligations shall release or discharge Guarantor unless and until all of the Obligations shall have been indefeasibly fully paid and discharged. Guarantor expressly waives presentment, protest, demand, notice of dishonor or default, notice of acceptance of this Guaranty, notice of advancement of funds under the Guaranteed Documents and all other notices and formalities to which Customer or Guarantor might be entitled, by statute or otherwise, and, so long as there are any Obligations or MLBFS is committed to extend credit to Customer, waives any right to revoke or terminate this Guaranty without the express written consent of MLBFS.

So long as there are any Obligations, Guarantor shall not have any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right, or remedy of MLBFS against Customer or any security which MLBFS now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law, or otherwise.

MLBFS is hereby irrevocably authorized by Guarantor at any time during the continuance of an Event of Default under the Loan Agreement or any other of the Guaranteed Documents or in respect of any of the Obligations, in its sole discretion and without demand or notice of any kind, to appropriate, hold, set off and apply toward the payment of any amount due hereunder, in such order of application as MLBFS may elect, all cash, credits, deposits, accounts, financial assets, investment property, securities and any other property of Guarantor which is in transit to or in the possession, custody or control of MLBFS or Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S"), or any of their respective agents, bailees or affiliates. Guarantor hereby collaterally assigns and grants to MLBFS a continuing security interest in all such property as additional security for the Obligations. Upon the occurrence and during the continuance of an Event of Default, MLBFS shall have all rights in such property available to collateral assignees and secured parties under all applicable laws, including, without limitation, the Uniform Commercial Code.

Guarantor agrees to furnish to MLBFS such financial information concerning Guarantor as may be required by any of the Guaranteed Documents or as MLBFS may otherwise from time to time reasonably request. Guarantor further hereby irrevocably authorizes MLBFS and each of its affiliates, including without limitation MLPF&S, to at any time (whether or not an Event of Default shall have occurred) obtain from and disclose to each other any and all financial and other information about Guarantor.

No delay on the part of MLBFS in the exercise of any right or remedy under any of the Guaranteed Documents, this Guaranty or any other agreement shall operate as a waiver thereof, and, without limiting the foregoing, no delay in the enforcement of any security interest, and no single or partial exercise by MLBFS of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy. This Guaranty may be executed in any number of counterparts, each of which counterparts, once they are executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Guaranty. This Guaranty shall be binding upon Guarantor and its successors and assigns, and shall inure to the benefit of MLBFS and its successors and assigns. If there are more than one guarantor of the Obligations, all of the obligations and agreements of Guarantor are joint and several with such other guarantors.

This Guaranty shall be governed by the laws of the State of Illinois. WITHOUT LIMITING THE RIGHT OF MLBFS TO ENFORCE THIS GUARANTY IN ANY JURISDICTION AND VENUE PERMITTED BY APPLICABLE LAW: (I) GUARANTOR AGREES THAT THIS GUARANTY MAY AT THE OPTION OF MLBFS BE ENFORCED BY MLBFS IN EITHER THE STATE OF ILLINOIS OR IN ANY OTHER JURISDICTION WHERE GUARANTOR, CUSTOMER OR ANY COLLATERAL FOR THE OBLIGATIONS OF CUSTOMER MAY BE LOCATED, (II) GUARANTOR IRREVOCABLY SUBMITS ITSELF TO JURISDICTION IN THE STATE OF ILLINOIS AND VENUE IN ANY STATE OR FEDERAL COURT IN THE COUNTY OF COOK FOR SUCH PURPOSES, AND (III) GUARANTOR WAIVES ANY AND ALL RIGHTS TO CONTEST SAID JURISDICTION AND VENUE AND THE CONVENIENCE OF ANY SUCH FORUM AND ANY AND ALL RIGHTS TO REMOVE SUCH ACTION FROM STATE TO FEDERAL COURT. GUARANTOR FURTHER WAIVES ANY RIGHTS TO COMMENCE ANY ACTION AGAINST MLBFS IN ANY JURISDICTION EXCEPT IN THE COUNTY OF COOK AND STATE OF ILLINOIS. MLBFS AND GUARANTOR HEREBY EACH EXPRESSLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES AGAINST THE OTHER PARTY WITH RESPECT TO ANY MATTER RELATING TO, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS GUARANTY AND/OR ANY OF THE TRANSACTIONS WHICH ARE THE SUBJECT MATTER OF THIS GUARANTY. GUARANTOR FURTHER WAIVES THE RIGHT TO BRING ANY NON-COMPULSORY COUNTERCLAIMS. Wherever possible each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty. No modification or waiver of any of the provisions of this Guaranty shall be effective unless in writing and signed by both Guarantor and an officer of MLBFS. Each signatory on behalf of Guarantor warrants that he or she has authority to sign on behalf of Guarantor, and by so signing, to bind Guarantor hereunder.

Dated as of July 24, 2000.

TEMAR INC.

By: _____

| Signature (1) | Signature (2) |

_Marshall Goldby_

| Printed Name | Printed Name |

_President_

| Title | Title |

Address of Guarantor:
    14 EAST HILL COURT
    TENAFLY, NJ 07670

EXHIBIT C

FORBEARANCE AGREEMENT

This **FORBEARANCE AGREEMENT** is entered into as of November 16, 2006 and will serve to confirm certain agreements of MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC. ("MLBFS"), Addressing Systems and Products, Inc. ("Customer"), Temar Inc. ("Temar") and Marshall Goldberg ("M. Goldberg") with respect to the following:

(i) a certain **WCMA LOAN AND SECURITY AGREEMENT NO.** 879-07D04 dated as of July 24, 2000 between MLBFS and Customer, as thereafter supplemented, renewed, extended and/or amended (the "WCMA Loan Agreement");

(ii) a certain **UNCONDITIONAL GUARANTY** dated as of July 24, 2000 given to MLBFS by M. Goldberg, (the "Personal Guaranty");

(iii) a certain **UNCONDITIONAL GUARANTY** dated as of July 24, 2000 given to MLBFS by Temar (the "Business Guaranty");

(iv) a certain **SECURITY AGREEMENT** dated as of July 24, 2000 given to MLBFS by Temar, as thereafter supplemented, renewed, extended and/or amended (the "Security Agreement");

(v) all other agreements between MLBFS and Customer or Temar or M. Goldberg or any other party who at any time has guaranteed or provided collateral, or will hereinafter guarantee or provide collateral (a "Guarantor", or, if plural, "Guarantors"), for Customer's obligations to MLBFS in connection therewith (the "Additional Agreements").

For purposes of this Forbearance Agreement, (i) Customer, Temar, M. Goldberg and Guarantor(s) are collectively referred to as the "Obligors", and (ii) the WCMA Loan Agreement, the Personal Guaranty, the Business Guaranty, the Security Agreement and Additional Agreements are collectively referred to as the "Loan Documents." Capitalized terms used herein and not defined herein shall have the meaning set forth in the Loan Documents.

## RECITALS

1.    On August 3, 2006 MLBFS sent Obligors a Notice of Default and Demand for Payment (the "Demand Notice"), which demanded, in part, that Obligors fully repay all amounts outstanding under the Loan Documents on or before 5:00 p.m. Central Standard Time on August 11, 2006. The Obligors failed to comply with the Demand Notice. As a result, one or more Events of Default has occurred and are continuing under the Loan Documents. Consequently, pursuant to the Loan Documents, MLBFS has accelerated all Obligations under the Loan Documents, making such Obligations immediately due and payable.

2.    Obligors represented to MLBFS that they were unable to fully repay the Obligations and thereupon requested (i) that MLBFS forbear from exercising its rights and remedies under the Loan Documents, and (ii) that MLBFS defer the full collection of the Obligations while Obligors seek alternative financing to fully repay the Obligations owed to MLBFS.

3.    As a result of their inability to fully repay the Obligations at this time, and to allow Obligors time to seek alternative financing, MLBFS has agreed (i) to forbear from exercising its rights and remedies under the Loan Documents pursuant to the terms and conditions hereof, and (ii) to defer the full collection of the Obligations subject to Obligors' full and complete compliance with all of the terms set forth in this Forbearance Agreement.

## AGREEMENT

Accordingly, in consideration of the premises and of the mutual covenants herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. **Recitals.** The Recitals are true, accurate and complete, are not misleading in any material respect, constitute a material part of this Forbearance Agreement, and are incorporated by reference as if fully set forth herein.

2. **Acknowledgment of Defaults and Events of Default.** Obligors acknowledge that (i) timely, adequate and proper notice of the occurrence of one or more defaults giving rise to one or more Events of Default under the Loan

the terms and conditions of the Loan Documents are in full force and effect, without waiver or modification of any kind whatsoever, and are ratified and confirmed in all respects.

6.  **Representations of Obligors.** In addition to any representations set forth in the Loan Documents, all of which are hereby ratified and confirmed in all respects, each of the Obligors represent that (i) Customer is a corporation that is organized, validly existing, and in good standing under the laws of the State of New York ; (ii) MLBFS has a first lien and security interest in the Collateral (iii) none of the Collateral is subject to any lien, encumbrance or security interest other than the liens and security interests of MLBFS; (iv) no litigation, arbitration, administrative or governmental proceedings are pending or, to the knowledge of Obligors, threatened against any Obligor, which would, if adversely determined, materially and adversely affect the liens and security interests of MLBFS hereunder or under any of the Loan Documents, the financial condition of any Obligor or the continued operations of any Obligor; and (v) Customer's principal place of business is 2 Penn Plaza, 26th Floor, New York, New York, 10001 ; and (vi) that none of the Obligors, or any other person or entity affiliated with, employed by, associated with, or related to any of them in any way, have any legal right or theory on which to invoke or obtain legal, equitable or other relief in order to abate, postpone, terminate or otherwise affect in any way the enforcement by MLBFS of the terms or provisions of the Loan Documents, and Obligors specifically, knowingly and intentionally waive and relinquish any such rights in their entirety.

7.  **Obligations of Obligors.** In exchange for MLBFS' agreement to forbear from exercising its rights and remedies under the Loan Documents and applicable law until Termination Date, Obligors hereby represent, warrant and agree as follows:

7.1. **Payments.** In exchange for MLBFS' agreement to forbear, Obligors hereby promise and agree to pay to the order of MLBFS, at the times and in the manner set forth below, the following payments:

    (i)    Upon execution of this Forbearance Agreement a payment by depositing into the WCMA account in the amount equal to the sum of $50,000.00 to be applied towards the Debt;

    (ii)    Beginning on December 14, 2006 and continuing on the tenth (10th) calendar day of each month thereafter through and including December 10, 2007 monthly payments equal to the sum of $10,000.00 each such monthly payment to be applied towards the Debt;

7.2 All of the payments set forth in Paragraph 7.1 are due on the dates specified with no grace period, and shall be sent to either (i) Merrill Lynch Business Financial Services Inc., 222 North LaSalle Street, 17th Floor, Chicago, IL 60601 Attention: Edmond Blough, or (ii) directly into the WCMA Account.

7.3 **Interest Rate.** Obligors acknowledge and agree that the Interest Rate on the Debt shall mean a variable per annum rate of interest equal to the sum of (i) 4.90% plus (ii) the interest rate from time to time published in the "Money Rates" section of *The Wall Street Journal* for 30-day high-grade unsecured notes sold through dealers by major corporations (the "30-day Dealer Commercial Paper Rate"). The Interest Rate will change as of the date of publication in *The Wall Street Journal* of a 30-day Dealer Commercial Paper Rate that is different from that published on the preceding Business Day. In the event that *The Wall Street Journal* shall, for any reason, fail or cease to publish the 30-day Dealer Commercial Paper Rate, MLBFS will choose a reasonably comparable index or source to use as the basis for the Interest Rate.

7.4 **Documentation Fee.** Obligors agree, upon execution of this Forbearance Agreement, to pay MLBFS a non-refundable Documentation Fee of $250.00 (the "Documentation Fee"). Customer agrees to pay the Documentation Fee with a check drawn on a non-Merrill Lynch checking account, and agrees that the Documentation Fee will be fully non-refundable once it has been paid.

7.5 **Additional Financial Disclosure.** In addition to those covenants and reporting obligations of Obligors pursuant to and by reason of the Loan Documents Obligors shall furnish or caused to be furnished to MLBFS with the following additional financial information, all of which shall be certified by Customer's chief financial officer or chief executive officer:

    (A) **Monthly Interim Financial Statements.** Within fifteen days (15) days after the close of each fiscal month of Customer, a copy of the Interim Financial Statements of both the Customer and Temar for each such fiscal

3

month, including in reasonable detail both a balance sheet as of the close of such fiscal period, and statement of profit and loss for the applicable fiscal period.

(B) **Monthly A/R Agings.** Within fifteen (15) days after the close of each fiscal month of Customer, a copy of the Accounts Receivable Agings of both the Customer and Temar as of the end of such fiscal month. Said reports shall be in reasonable detail, shall clearly denote all foreign accounts, shall clearly denote all accounts due from related parties, employees, shareholders, etc., shall clearly denote any accounts with C.O.D. terms, and shall clearly denote any accounts due from state or federal government agencies.

**8. Obligations of MLBFS.** If there are no Events of Default under this Forbearance Agreement, and no other Events of Default, other than the existing Events of Default referenced in this Forbearance Agreement, occurs under the Loan Documents between the date of this Forbearance Agreement and the Termination Date MLBFS will agree to forbear from exercising its legal rights and remedies as a secured creditor under the Loan Documents or under common or statutory law.

**9. Waiver Of Existing Financial Covenant Defaults.** Certain Defaults under the Loan Documents (hereinafter referred to as the "Identified Defaults") have occurred and are continuing by the failure on the part of Customer or M. Goldberg as the case may be, to maintain:

(i) A "Leverage Ratio" not in excess of 4.5 to 1, as required pursuant to the WCMA Loan Agreement. Customer hereby represents and warrants to MLBFS that as of December 31, 2005, Customer's "Leverage Ratio" exceeded the 4.5 to 1 requirement; and

(ii) A "Tangible Net Worth" in excess of $250,000.00, as required pursuant to the WCMA Loan Agreement. Customer hereby represents and warrants to MLBFS that as of December 31, 2005, Customer's "Tangible Net Worth" is less than $250,000.00;and

(iii) A "Personal Liquidity" of M. Goldberg not in an amount greater than $100,000.00, as required pursuant to that WCMA Loan Agreement as Amended by that certain Letter Agreement dated as of June 15, 2001. Customer hereby represents and warrants to MLBFS that as of August 8, 2006 the "Personal Liquidity" is less than $100,000.00.

Under the terms of the Loan Documents, MLBFS has certain rights and remedies available to it with respect to the Identified Defaults. Customer has requested that MLBFS waive the Identified Defaults. MLBFS has agreed to do so, provided that Customer's representations and warranties set forth herein are true and correct in all respects, and subject to the terms hereof.

Customer and the other Obligors acknowledge that the waivers specifically set forth above in this paragraph 9 are limited precisely as written and except for the waivers of the Defaults described above for the dates specified, all other terms and conditions of the WCMA Loan Agreement shall remain in full force and effect and nothing contained herein shall be deemed to constitute a waiver of any future Default relating to the Identified Defaults, and that such waivers do not in any manner constitute any waiver of either (a) any of MLBFS' rights, remedies or powers pursuant to the WCMA Loan Agreement, any Loan Document, or any other agreement, document or instrument or applicable law, or (b) any default or Event of Default under the WCMA Loan Agreement, with the exception of the waiver of the Identified.

**10. Release of MLBFS.** Obligors, for itself and by its employees, agents, servants and representatives, completely release and forever discharge MLBFS and its parents, affiliates, subsidiaries, and divisions, and each such entity's officers, directors, shareholders, employees, owners, partners, agents, successors, and assigns, of and from any and all causes of action, claims, or demands whatsoever, in law or in equity, whether now known or hereafter discovered, including but not limited to those that in any way pertain to the Loan Documents or arise from the conduct of MLBFS, its parents, affiliates, subsidiaries, and divisions.

**11. No Distributions, Loans and Transfers.** Except upon the prior written consent of MLBFS, neither Customer nor any other Obligor shall (i) directly or indirectly pay any dividends or make any other distributions on account of its stock to its shareholders, (ii) directly or indirectly lend any money to, or guaranty the Obligations of, any shareholder or other affiliated person or entity, or (iii) directly or indirectly lend any money, or transfer any assets or property, to any other person or entity other than arms length transfers for fair consideration in the ordinary course of business.

4

(vi) MLBFS may sell and deliver any Collateral at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as MLBFS deems advisable, at MLBFS' discretion. MLBFS may, if MLBFS deems it reasonable, postpone or adjourn any sale of the Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale without giving a new notice of sale.

(vii) Obligors agree that MLBFS has no obligation to preserve rights to the Collateral or marshal any assets, including the Collateral, for the benefit of any person.

(viii) MLBFS is hereby granted a license or other right to use, without charge, Obligors' labels, patents, copyrights, name, trade secrets, trade names, trademarks, and advertising matter, or any similar property, in completing production, advertising or selling any Collateral and Obligors' rights under all licenses and all franchise agreements shall inure to MLBFS's benefit. Any requirement of reasonable notice shall be met if such notice is mailed postage prepaid to Customer at its address set forth above in this Forbearance Agreement at least five (5) days before sale or other disposition. The proceeds of any sale shall be applied first to all attorney fees and other expenses of sale, and second on account of the Debt in such order as MLBFS shall elect, in its sole discretion. MLBFS shall return any excess proceeds to Customer, and Obligors shall remain jointly and severally liable for any deficiency to the fullest extent permitted by law.

(ix) Except as otherwise provided herein, MLBFS shall have the continuing and exclusive right to apply or reverse and reapply any and all payments to any portion of the Debt in such order and in such manner as MLBFS shall determine in its sole discretion. To the extent that Obligors make a payment or MLBFS receives any payment or proceeds of the Collateral which is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor-in-possession, receiver or any other party under any bankruptcy law, common law or equitable cause, or otherwise, then to such extent, the Debt or the part of the Debt that was intended to be satisfied by such payment shall be revived and continue as if such payment or proceeds had not been received by MLBFS.

(x) Obligors shall perform without objection any other act required or requested by MLBFS under any right or remedy given to it pursuant to the Loan Documents or under the law.

16. **Review of Books and Records.** In further consideration of MLBFS' agreement to forbear from exercising its rights, Obligors will continue to allow MLBFS to have access to Obligors' offices so as to allow MLBFS to review and inspect each of such Obligor's books, records and Collateral.

17. **Insurance.** Obligors agree that the Obligors shall maintain insurance on all Collateral under a policy or policies of physical damage insurance for the full replacement value thereof, providing that losses will be payable to MLBFS as its interests appear pursuant to the lender's or mortgagee's long form loss payable endorsement. Obligors shall further maintain a policy or policies of commercial general liability. Obligors further agree that MLBFS may at its sole and absolute discretion, obtain, and maintain insurance on the Collateral under a policy or policies of physical damage insurance for the full replacement value thereof and providing that losses will be payable to MLBFS. Obligors agree to execute any and all documents necessary in order for MLBFS to obtain and maintain insurance on the Collateral.

18. **Sales of Assets.** Without the prior written consent of MLBFS, none of the Obligors shall sell, transfer or otherwise dispose of any of their respective assets or Collateral other than in the ordinary course of dealing. Additionally, in the event that any Obligor should at any time find alternate financing (directly or indirectly) or raise directly or indirectly any additional equity during the Forbearance period, such Obligor shall remit said proceeds directly to MLBFS as a permanent pre-payment of the Debt.

19. **Execution of Documents.** Obligors agree to execute all documents necessary to effectuate the terms and conditions of this Forbearance Agreement.

20. **Course of Dealing.** No course of dealing on the part of Obligors or any delay or failure on the part of MLBFS to exercise any right shall operate as a waiver of such rights or otherwise prejudice MLBFS' rights, powers or remedies.

21. **No Further Advance.** Obligors acknowledge and agree that, except as expressly provided for in this Forbearance Agreement, MLBFS has no obligation to advance, provide or loan any further or additional monies or credit to Obligors. Obligors further acknowledge and agree that, except as expressly provided for in this Forbearance Agreement, that MLBFS has no obligation to grant any further forbearance to Obligors or to extend the time for the repayment of the Debt beyond the Termination Date of this Forbearance Agreement.

(d) Copies of the Federal Tax Returns for fiscal year ending December 31, 2005 for both Customer and Temar, including all schedules respectively attached thereto.

(e) An executed copy of the DPI Sale Agreement in form and substance acceptable to MLBFS, in its sole and absolute discretion.

If no further Event of Default, or event which with the giving of notice, passage of time, or both, would constitute an Event of Default, shall then have occurred and be continuing under the terms of the Loan Documents, then the amendments and agreements in this Forbearance Agreement will become effective on the date (the "Effective Date") upon which: (i) Obligors have complied with the above conditions; and (ii) an officer of MLBFS shall have reviewed and approved this Forbearance Agreement and all of the other documents as being consistent in all respects with the original internal authorization hereof. If Obligors do not return to MLBFS (a) the fully executed original copy of this Forbearance Agreement and (b) any other documents reasonably required by MLBFS, in its sole discretion, to effectuate the terms of this Forbearance Agreement all by December 14, 2006 or if for any other reason (other than the sole fault of MLBFS) the Effective Date shall not occur by December 14, 2006 then this Forbearance Agreement and all of the terms contained herein may, at the sole option of MLBFS, be declared to be null and void and be of no force and effect.

**IN WITNESS WHEREOF**, the parties have signed and delivered this Forbearance Agreement, on or about the date stated above.

MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.

By: _____

Printed Name: EDMOND J BLOUGH

Title: VICE PRESIDENT

ADDRESSING SYSTEMS AND PRODUCTS, INC.

By: _____

Printed Name: Marshall Goldberg

Its: Pres

TEMAR INC.

By: _____

Printed Name: Marshall Goldberg

Its: Pres.

MARSHALL GOLDBERG

9